IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

LINDA M. TORREY,

        Plaintiff,

                             6:13-CV-01333-PK

                             OPINION AND

v.                             ORDER

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

        Defendant.

_____

PAPAK, Magistrate Judge:

        Plaintiff Linda M. Torrey filed this action on August 8, 2013, seeking judicial review of

the Commissioner of Social Security's final decision denying her applications for disability

insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of

the Social Security Act (the "Act"). This court has jurisdiction over plaintiff's action pursuant to

42 U.S.C. § 405(g) and 1383(c)(3). I have considered the parties' briefs and the evidence in the

Page 1 - OPINION AND ORDER

administrative record.  For the reasons set forth below, the Commissioner's decision is reversed and the matter is remanded for further proceedings.

## DISABILITY ANALYSIS FRAMEWORK

To establish disability within the meaning of the Act, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  The Commissioner has established a five-step sequential process for determining whether a claimant has made the requisite demonstration. *See Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); *see also* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  At the first four steps of the process, the burden of proof is on the claimant; only at the fifth and final step does the burden of proof shift to the Commissioner.  *See Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

At the first step, the Administrative Law Judge considers the claimant's work activity, if any.  *See Bowen*, 482 U.S. at 140; *see also* 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  If the ALJ finds that the claimant is engaged in substantial gainful activity, the claimant will be found not disabled.  *See Bowen*, 482 U.S. at 140; *see also* 20 C.F.R. §§ 404.1520(a)(4)(i), 404.1520(b), 416.920(a)(4)(i), 416.920(b).  Otherwise, the evaluation will proceed to the second step.

At the second step, the ALJ considers the medical severity of the claimant's impairments. *See Bowen*, 482 U.S. at 140–41; *see also* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  An impairment is "severe" if it significantly limits the claimant's ability to perform basic work activities and is expected to persist for a period of twelve months or longer.  *See Bowen*, 482 U.S.

at 141; *see also* 20 C.F.R. §§ 404.1520(c), 416.920(c). The ability to perform basic work

activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. §§

404.1521(b), 416.921(b); *see also Bowen*, 482 U.S. at 141. If the ALJ finds that the claimant's

impairments are not severe or do not meet the duration requirement, the claimant will be found

not disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c),

416.920(a)(4)(ii), 416.920(c). Nevertheless, it is well established that "the step-two inquiry is a

de minimis screening device to dispose of groundless claims." *Smolen v. Chater*, 80 F.3d 1273,

1290 (9th Cir. 1996), *citing Bowen*, 482. U.S. at 153–54. "An impairment or combination of

impairments can be found 'not severe' only if the evidence establishes a slight abnormality that

has 'no more than a minimal effect on an individual[']s ability to work." *Id.*, *quoting* S.S.R. 85-

28, 1985 SSR LEXIS 19 (1985).

    If the claimant's impairments are severe, the evaluation will proceed to the third step, at

which the ALJ determines whether the claimant's impairments meet or equal "one of a number of

listed impairments that the [Commissioner] acknowledges are so severe as to preclude

substantial gainful activity." *Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iii),

404.1520(d), 416.920(a)(4)(iii), 416.920(d). If the claimant's impairments are equivalent to one

of the impairments enumerated in 20 C.F.R. § 404, subpt. P, app. 1, the claimant will

conclusively be found disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§

404.1520(a)(4)(iii), 404.1520(d), 416.920(a)(4)(iii), 416.920(d).

    If the claimant's impairments are not equivalent to one of the enumerated impairments,

between the third and the fourth steps the ALJ is required to assess the claimant's residual

functional capacity ("RFC"), based on all of the relevant evidence in the claimant's case record.

*See* 20 C.F.R. §§ 404.1520(e), 416.920(e).  The RFC is an estimate of the claimant's capacity to perform sustained, work-related physical and/or mental activities on a regular and continuing basis,[1] despite the limitations imposed by the claimant's impairments.  *See* 20 C.F.R. §§ 404.1545(a), 416.945(a); *see also* S.S.R. No. 96-8p, 1996 SSR LEXIS 5 (July 2, 1996).

At the fourth step of the evaluation process, the ALJ considers the RFC in relation to the claimant's past relevant work.  *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  If, in light of the claimant's RFC, the ALJ determines that the claimant can still perform his or her past relevant work, the claimant will be found not disabled.  *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f), 416.920(a)(4)(iv), 416.920(f).  In the event the claimant is no longer capable of performing his or her past relevant work, the evaluation will proceed to the fifth and final step, at which the burden of proof shifts, for the first time, to the Commissioner.

At the fifth step of the evaluation process, the ALJ considers the RFC in relation to the claimant's age, education, and work experience to determine whether a person with those characteristics and RFC could perform any jobs that exist in significant numbers in the national economy.  *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 404.1560(c), 404.1566, 416.920(a)(4)(v), 416.920(g), 416.960(c), 416.966.  If the Commissioner meets her burden to demonstrate the existence in significant numbers in the national economy of jobs capable of being performed by a person with the RFC assessed by the ALJ between the third and fourth steps of the five-step process, the claimant is found not to be disabled.  *See Bowen*,

---

[1] "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule."  S.S.R. No. 96-8p, 1996 SSR LEXIS 5 (July 2, 1996).

Page 4 - OPINION AND ORDER

482 U.S. at 142; *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 404.1560(c), 404.1566, 416.920(a)(4)(v), 416.920(g), 416.960(c), 416.966. A claimant will be found entitled to benefits if the Commissioner fails to meet that burden at the fifth step. *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 416.920(a)(4)(v), 416.920(g).

## LEGAL STANDARD

A reviewing court must affirm an Administrative Law Judge's decision if the ALJ applied proper legal standards and his or her findings are supported by substantial evidence in the record. *See* 42 U.S.C. § 405(g); *see also Batson v. Comm'r for Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004). "'Substantial evidence' means more than a mere scintilla, but less than a preponderance; it is such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007), *citing Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006).

The court must review the record as a whole, "weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Id.*, *citing Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998). The court may not substitute its judgment for that of the Commissioner. *See id.*, *citing Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006); *see also Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001). If the ALJ's interpretation of the evidence is rational, it is immaterial that the evidence may be "susceptible [of] more than one rational interpretation." *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989), *citing Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984).

## BACKGROUND

Linda Torrey was born May 9, 1956. Tr. 23, 95, 151.[2]  She attended school through the

tenth grade, received average grades, attended no special education classes, did not receive her

GED,[3] and has received no subsequent formal education or vocational training.  Tr. 66, 364, 429,

499.  According to the evidence of record, Torrey worked full-time as a cook for various

restaurants between 1994 and 2003.  Tr. 12, 156–61, 200, 364, 499–500.  She then worked as a

housekeeper for Phoenix Inn from 2003 through 2006, prior to her claimed disability onset date

of January 4, 2006.  Torrey was fired in January 2006 for her alleged involvement "in a scheme

to get a reward for a ring she had found in a room."  Tr. 499; Tr. 67–68, 85, 173, 200, 206, 364.

Torrey has been unemployed since her claimed disability onset date.  Tr. 67, 222, 364, 499–500.

The earliest medical record appearing in the administrative record is a report from

February 23, 2005, when Torrey sought emergency treatment for persistent chest pains that began

after she lifted a heavy mattress in the course of her work at the Phoenix Inn.  Tr. 262.  A

treatment in April 2005 revealed lesions related to cervical intraepithelial neoplasia ("CIN").  Tr.

233–44.  Follow-up on that examination in July 2005 by Dr. Martha Kim resulted in surgery to

remove Torrey's lesions, as well as a recommendation for further surgery.  Tr. 308, 312–13.  In

the course of her discussions with Dr. Kim during that treatment, Torrey revealed issues with

anxiety, sleep loss, and depression.  Tr. 316.

---

[2]  Citations to "Tr." refer to the page(s) indicated in the official transcript of the
administrative record filed herein as Docket No. 11.

[3]  The administrative record contains factual inconsistencies regarding Torrey's GED
completion.  A psychosocial examination conducted by Christine Rogers in June 2010 indicates
Torrey did, in fact, acquire her GED.  Tr. 429.  Similar evaluations conducted in March 2010 by
Dr. Pamela Joffe and in April 2012 by Dr. David Northway state the opposite.  Tr. 364, 499.

Subsequent reports in 2005, dated July through December, document Torrey's medical treatment for four separate abscesses resulting from her heroin use. Tr. 247, 252, 255, 259, 316.

In January 2006, Dr. Kim conducted additional examinations that revealed further signs of CIN and invasive cancer cells. Tr. 304. Dr. Kim determined that Torrey required a vaginal hysterectomy, which was conducted on March 20, 2006. Tr. 279. In May 2006, Dr. Audrey Garrett revealed to Torrey that post-surgery pathology reports shoed no evidence of persistent or residual cancer. Tr. 275.

In February 2007, Torrey sought a routine physical examination from Dr. Kim, who noted that Torrey was incredibly thin and was using morphine multiple times per week. Tr. 301–02. Torrey reported feeling depressed and constantly sick. Tr. 302. In her report, Dr. Kim mentions concerns over polydipsia, polyphagia, and polyuria, the three hallmark symptoms of diabetes. Tr. 303.

In June 2007, Torrey visited an urgent care clinic seeking treatment for an abscess from which she had suffered for three months, but claimed she did not use heroin during that period. Tr. 292.

In February 2008, Torrey visited Dr. Kim seeking treatment for inguinal lymph node inflamation. Tr. 299. Dr. Kim reported that Torrey gained weight and had not used heroin for one year. *Id.* At that point, Torrey was living with her elderly parents. *Id.*

In November 2008, Torrey sought treatment for recurring acute headaches that began during a period of straining. Tr. 390. The treating physician noted that Torrey's affliction was possibly a prolonged sinus infection or cluster headaches, and he informed her of the potentially serious problems relating to each. Tr. 391. After the physician ordered a CT scan, however,

Torrey left through the office's backdoor and did not return. *Id.*

In February 2009, Torrey once again visited Dr. Kim, this time seeking treatment related to bi-weekly headaches. Tr. 296. Dr. Kim tentatively diagnosed Torrey with cluster headaches and indicated that Torrey reported she was not using illicit drugs. *Id.*

In 2009, Torrey sought treatment on three separate occasions between July and December for various abscesses. Tr. 356, 375, 379. Two medical reports state that Torrey denied recent drug use. Tr. 375, 379. A third report states that her social history was positive for illicit drug use, yet is unclear as to her use status at the time. Tr. 356. The administrative record contains no other medical records dating from prior to Torrey's application for disability insurance benefits.

On January 12, 2010, Torrey protectively filed applications for both DIB and SSI. Tr. 144–55. Her alleged disability onset date was January 2006 and she listed uterine cancer, pain, depression, and anxiety as the primary limitations on her ability to work. Tr. 172.

On January 18, 2010, Torrey sought treatment for an abscess situated in the same bodily region as the abscess treated in December 2009. Tr. 344. The dictating physician for that visit, Dr. Alexander Morley, noted that Torrey's behavior was inappropriate and described her as anxious and tearful. *Id.*

In March 2010, Torrey underwent a physical examination conducted by Dr. DeWayde Perry. During the examination, Torrey reported persistent lower back pain dating 35 years, which was exacerbated by walking more than two blocks or lifting weights. Tr. 358. Torrey admitted to occasional marijuana use but denied having used heroin for four years. Tr. 359. Dr. Perry provided a functional assessment limiting Torrey's maximum standing and walking to six hours, placing no limits on alternating sitting and standing, and limiting Torrey's lifting and

carrying capacity to 20 pounds occasionally and 10 pounds frequently. Tr. 362. Torrey was

diagnosed with intermittent claudication—or pain caused by inhibited bloodflow—in her lower

extremities, possible degenerative disc disease, and restrictive lung disease. Tr. 361.

On Dr. Perry's recommendation, Torrey received a psychological examination later that

month. Dr. Pamela Joffe noted that Torrey was in the process of being evicted and Torrey's

husband was recently arrested on charges for failure to appear. Tr. 364. Torrey admitted to

weekly marijuana use and monthly heroin use, with her last use in February 2010, one month

before the assessment. Tr. 364. Notably, that time frame is inconsistent with her claimed four-

year non-use documented in Dr. Perry's report from the same month. *Compare* Tr. 359 *with* Tr.

364. Additionally, Torrey reported general disinterest and deepening depression. Tr. 365. She

also mentioned phantasmic hallucinations, paranoid nightmares, and persistent flashbacks. Tr.

366.

During Torrey's psychological examination, Dr. Joffe administered cognitive testing that

revealed perfect orientation, no difficulty performing simple addition, some recollection

difficulty, and strong spelling and geographical performance. Tr. 366–67. Additional subtests

revealed further impairments. On the Woodcock Johnson mental aptitude test, Torrey tested at a

grade equivalent of 3.8 and was limited to performing only simple addition, subtraction,

multiplication, and division. Tr. 367. On both the Beck Anxiety Inventory as well as the Beck

Depression Inventory, Torrey placed in the "severe" range based on her perceived fears and

hopelessness. *Id.* Torrey was further diagnosed with nicotine dependence, cannabis abuse,

opioid abuse, adjustment disorder, and rule out borderline intellectual functioning. *Id.* In terms

of Torrey's concentration and attention, Dr. Joffe noted an inability to understand and comply

Page 9 - OPINION AND ORDER

with complicated instructions due to low stamina and pyschosocial stressors.  Tr. 368.

Later in March 2010, Torrey underwent a mental residual functional capacity assessment

in the care of Megan Nicoloff, Psy.D.  Tr. 409–11.  Nicoloff recorded few limitations and

indicated that Torrey had "moderately limited" abilities, including the ability to understand and

remember detailed instructions; to maintain attention and concentration for extended periods; to

carry out detailed instructions; and to interact appropriately with the general public.  *Id.*

Nicoloff's final functional assessment was reported as follows:

> This clmt is able to understand and follow simple 1-2 step commands.
> In a routine, slow paced setting not in close contact with the public,
> she would be able to sustain adequate [attention, concentration, or
> persistence] for completion of 1-2 step commands. She is able to
> complete a normal work schedule.

Tr. 411.

In April 2010, Torrey reported being diagnosed with Hepatitis C on a disability appeal

report.  Tr. 208–17.  Torrey noted that her illnesses and conditions did not affect her ability to

care for her personal needs and, in response to a query regarding changes in daily activity since

her initial disability report, Torrey wrote "I just sit around and cry a lot. Depression is getting

worse."  Tr. 215.

In May 2010, Torrey underwent another mental and pyschosocial assessment.  Christine

Rogers, MA, QMHP, noted that Torrey reported feeling depressed and was having trouble

sleeping.  Tr. 426.  Rogers additionally noted that, at the time, Torrey was facing significant

issues with her housing situation and her husband's incarceration.  *Id.*  Rogers documented

Torrey's heroin use for the preceding seven months at three "hits" daily, costing approximately

forty dollars per day.  Tr. 427.  Beyond substance abuse, Rogers classified Torrey's social skills

as adequate and her attitude as cooperative. Tr. 430. Rogers reported Torrey had a depressed, anxious, and apprehensive mood. *Id.* Rogers marked Torrey's thought process as exhibiting suicidal ideas. Tr. 430. Rogers' assessment further revealed that Torrey was alert, oriented, and had unimpaired memory but impaired concentration. Dr. Rogers deemed Torrey's abstract thinking as appropriate and estimated that she had normal intelligence but poor judgment. Tr. 431.

In October 2010, Torrey received a second mental residual functional capacity assessment. Tr. 459–61. In his report, Dr. Robert Henry found that Torrey was moderately limited in her abilities to carry out detailed instructions; work in coordination with or proximity to others without being distracted by them; get along with coworkers and peers without distracting them; respond appropriately to changes in the work setting; be aware of normal hazards and take appropriate precautions; and set realistic goals or make plans independently of others. Tr. 459–60. Beyond that, Dr. Henry found marked limitation, a more severe rating, in Torrey's ability to interact appropriately with the general public. Tr. 460. In Dr. Henry's summary and explanation of his findings, he recorded Torrey "is capable of understanding, remembering and carrying out simple, routine tasks and instructions" but that she "should avoid direct public contact due to her symptoms and substance abuse." Tr. 461. Dr. Henry further recommended that Torrey would perform best in an environment with few distractions, a slow pace, and minimal hazards based on her drug use and potential for relapse. *Id.*

In December 2010, Torrey reported depression and inconsistent sciatic pain to Dr. David Phelps. Tr. 566. Dr. Phelps diagnosed her with "acute on chronic" depression related to her alcohol and drug abuse. *Id.*

Page 11 - OPINION AND ORDER

On June 1, 2011, Torrey was expelled from the Center for Family Development, a multi-purpose substance abuse recovery clinic, due to being "caught in a cycle of drug use" and a need for "more sobriety to continue thoughtfully." Tr. 515.

On June 29, 2011, Torrey was hospitalized for an abscess and discharged on July 2, 2011. Tr. 474–75. Later that day, however, Torrey was re-hospitalized with acute respiratory failure due to pulmonary edema, possible adrenal insufficiency, and hypotension. Tr. 483.

In April 2012, psychologist Dr. David Northway conducted a full neuropsychosocial examination on Torrey. Tr. 498. Torrey reported psychological and sexual abuse during her childhood. Tr. 499. She gave inconsistent reports of both marijuana and heroin use; initially admitting to having used marijuana over one month prior to examination and subsequently stating she had used it less than two weeks prior. *Id.* Regarding her heroin use, Torrey reported not having used heroin for five years, which is inconsistent with her reports of more recent use to Dr. Perry and Dr. Joffe in March 2010 and Christina Rogers in May 2010. Tr. 359, 364, 427.

Torrey also reported hallucinations and paranoia to Dr. Northway, consistent with those reported to Dr. Perry in March 2010. Tr. 359, 501. Dr. Northway noted that Torrey used slow, simplistic speech and was prone to confusion. Tr. 501. He also documented Torrey's reported attempt at suicide by overdose in December 2011. *Id.*

Dr. Northway then conducted a series of psychological diagnostic tests, reporting that Torrey performed well on a hidden object task, a vigilance task, a spelling test, and a learning test. *Id.* Torrey failed a recollection task. *Id.* Further tests revealed moderate impairments in simple tracking, sequencing, and mental efficiency tasks; unremarkable performance on an expressive and receptive language test; and unremarkable to better-than-expected performance on

memory tests. Tr. 502. Finally, Torrey showed a lack of judgment, poor decision-making, and limited abstract thinking skills based on an adult intelligence test. *Id.* Dr. Northway reported that Torrey seemed to suffer from depression, anxiety, and dependency. Tr. 503.

Dr. Northway next opined that Torrey struggles in social settings and appeared to have impairments regarding cooperative and collaborative work based on emotional, intellectual, mood, and communicative limitations. *Id.*

Dr. Northway's reported Axis I diagnostic impressions include Opioid Dependence in full remission, Depressive Disorder with psychotic features, Rule Out Schizoaffective Disorder, Rule Out Bipolar I Disorder, Adjustment Disorder with anxiety, and Pain Disorder with psychological factors. *Id.* His Axis II diagnostic impression listed Mild Mental Retardation in Torrey's verbal comprehension and perceptual spheres, and Rule Out Personality Disorder with antisocial and dependent features. Tr. 504.

Finally, Dr. Northway's statement of ability to do work related activities showed mild restrictions on understanding and carrying out simple instructions, moderate restrictions on making simple work-related judgments, marked restrictions on understanding and carrying out complex instructions, and marked restrictions on making complex work-related judgments. Tr. 506. Regarding social limitations, Dr. Northway indicated that Torrey has marked limitations in all aspects of dealing with others. Tr. 507.

In May 2012, Torrey presented herself to Dr. Phelps for an examination related to leg pain she experienced after exercise. Tr. 563. Dr. Phelps noted Torrey's history of claudication and issued a diagnosis of the same. Tr. 564. Additionally, he observed Torrey to be well developed, well nourished, and in no acute distress. *Id.*

Torrey's claims for DIB and SSI were denied initially and upon reconsideration. Tr. 98, 122. Torrey timely requested an administrative hearing, which was held on June 14, 2012. Tr. 60. In response to the hearing, the ALJ issued an opinion finding Torrey had specific impairments that rendered her unable to return to past work, yet did not preclude performance of less strenuous work. Tr. 23–24. Thus, the ALJ concluded Torrey was not disabled. Tr. 25. The Appeal's Council denied Torrey's request to review the ALJ's decision. The ALJ's decision, therefore, became the Administration's final order for purposes of judicial review. *See* 20 C.F.R. § 422.210(a); *see also Sims v. Apfel*, 530 U.S. 103, 107 (2000). Torrey then filed this action seeking payment of DIB and SSI. Tr. 1.

## SUMMARY OF ALJ FINDINGS

At the first step of the five-step sequential evaluation process, the Administrative Law Judge found that Torrey did not engage in substantial gainful activity at any time following her claimed disability onset date of January 24, 2006. Tr. 14. The ALJ then proceeded to the second step of the analysis.

At the second step, the ALJ found that Torrey suffers from the following severe impairments: lumbar degenerative disc disease, hepatitis C, depression, anxiety disorder, lower extremity claudication, cervical cancer status post hysterectomy, borderline intellectual functioning, restrictive lung disease, substance abuse disorder (heroin), and substance addiction disorder (cannabis). *Id.* The ALJ further noted that Torrey has historically received "varying diagnoses for her mental health condition depending on her presentation during different examinations. For example, some medical providers diagnosed adjustment disorder instead of, or in addition to, anxiety and depression." *Id.*

At the third step, the ALJ found that none of Torrey's impairments were the equivalent of any of the impairments enumerated in 20 C.F.R. § 404, subpt. P, app. 1. Tr. 15. The ALJ therefore properly conducted an assessment of Torrey's residual functional capacity ("RFC"). Specifically, the ALJ found that at all material times Torrey had

> the residual functional capacity to perform light work . . . except she can lift 20 pounds occasionally and 10 pounds frequently. She can sit for 6 hours and stand for 6 hours in an 8-hour workday . . .

Tr. 17. The ALJ further limited Torrey's RFC to simple, low-stress, non-production line work. *Id.* The ALJ further assessed that Torrey can understand, remember, and carry out simple instructions that can be learned in 30 days or less. *Id.* In reaching this finding, the ALJ considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. *Id.*

At the fourth step of the five-step process, the ALJ found that Torrey was unable to perform her past relevant work. Tr. 23.

At the fifth step, the ALJ found that, in light of Torrey's age, education, work experience, and RFC, there were jobs existing in significant numbers in the national and local economy that she could perform. Tr. 23. Because the ALJ had determined Torrey was capable of making a successful adjustment to other work, and could perform all or substantially all of the exertional demands of work at a given level of exertion, she stated that, pursuant to Medical-Vocational Rule 201.28, a finding of "not disabled" was appropriate. Tr. 24. On that basis, the ALJ concluded that Torrey was not disabled as defined in the Act at any time between January 24, 2006, and July 13, 2012. Tr. 25.

## ANALYSIS

Torrey contends that the ALJ erred because she: (1) improperly rejected Dr. Northway's opinion regarding Torrey's social limitations; (2) failed to include Dr. Northway's diagnosis of Mild Mental Retardation at step two of the sequential analysis; (3) failed to address Torrey's diagnosed intellectual disability under Listing 12.05C; and (4) failed to fully credit lay witness testimony. Torrey further argues that, in light of the alleged errors in the ALJ's assessment of her RFC, the Commissioner failed to carry her burden at the fifth step of the five-step process. I address each of Torrey's arguments in turn.

## I.    Rejection of Medical Evidence

### A.    Medical Opinion of Dr. Northway

Torrey asserts that the ALJ erred in rejecting the medical evidence provided by examining physician Dr. Northway. The ALJ is responsible for resolving conflicts in the medical record. *Benton v. Barnhart*, 331 F.3d 1030, 1040 (9th Cir. 2003). Physicians with the most significant clinical relationship with a claimant are generally entitled to more weight than physicians with lesser relationships. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995); 20 C.F.R. §§ 404.1527(d), 416.927(d). As such, the ALJ may only reject a treating or examining physician's uncontradicted medical opinion based on "clear and convincing reasons." *Lester*, 81 F.3d at 830–31. Where such an opinion is contradicted, however, it may be rejected for "specific and legitimate reasons that are supported by substantial evidence in the record." *Id.*

As the Commissioner properly identifies, Dr. Northway's findings with respect to Torrey's social limitations, primarily that Torrey would "have difficulty interacting with others in any sort of appropriate manner" and that she is markedly limited in all aspects of social

functioning, are contradicted by several medical opinions of record. First, Dr. Joffe's opinion is mildly contradictory, explaining that Torrey is "generally avoidant of others" but "[gets] along as much as possible with others in the work setting." Tr. 368. Second, Megan Nicoloff's assessment that Torrey is only moderately, rather than markedly, limited in her ability to act appropriately with the general public also contradicts Dr. Northway's opinion. Tr. 410. Nicoloff's assessment, however, indicated that Torrey has "many antisocial features." Tr. 402. Finally, Dr. Henry found "no indication that [Torrey] is incapable of working in the vacinity [sic] of others without becoming distracted or distractable [sic]," which constitutes another contradiction of Dr. Northway's opinion. Tr. 461.

Because Dr. Northway's medical opinion is contradicted by other medical evidence in the record, the ALJ must provide specific and legitimate reasons supported by substantial evidence for her rejection to be proper. *Lester*, 81 F.3d at 830.

The ALJ afforded "little weight" to Dr. Northway's medical opinion "because it is largely based on the claimant's history regarding her drug use that was not truthful." Tr. 22. Torrey argues, and the Commissioner concedes, that this reason is invalid and not supported by substantial evidence. In the record, Dr. Northway notes his apprehensions regarding the subjective information provided by Torrey. Tr. 499. He explained that his psychosocial history summary "was provided by Ms. Torrey, without corroboration, except where noted" and "could contain significant historical inaccuracies." *Id.* Nonetheless, in other areas of his opinion, Dr. Northway proceeded to list an array of objective psychological evaluations, observations, and assessments. Tr. 499–503. Thus, the first reason listed by the ALJ for rejecting Dr. Northway's opinion is illegitimate. *See Ghanim v. Colvin*, 763 F.3d 1154, 1162–63 (9th Cir. 2014).

Page 17 - OPINION AND ORDER

The ALJ further considered Dr. Northway's finding of "marked" limitations in social interaction inconsistent with "the claimant's reported ability to use public transportation, attend meetings, sign for money and get along with others." Tr. 22. An ALJ may properly reject the opinion of a medical source if that opinion conflicts with evidence of the claimant's daily activities. *Morgan v. Commissioner*, 169 F.3d 595, 601–02 (9th Cir. 1999); *see also Bagby v. Astrue*, 2012 WL 1114298, *8 (D. Or. Feb. 7, 2012), adopted by *Bagby v. Astrue*, 2012 WL 1114298 (D. Or. Apr. 3, 2012) (ALJ properly rejected examining doctor's opinion that was inconsistent with the claimant's own prior statements about his ability to function).

While the ALJ's reliance on several of Torrey's daily activities to reject Dr. Northway's opinion is a legitimate reason, it must still be supported by substantial evidence. *Lester*, 81 F.3d at 830–31. This issue was recently analyzed in *Ghanim v. Colvin*, 763 F.3d 1154 (9th Cir. 2014), where the court expounded on established precedent that "[a] claimant need not be completely incapacitated to receive benefits," and found that a record revealing extensive social limitations, as here, is not nullified by a claimant's performance of basic daily activities with simple social interaction. *Id.* at 1162, *citing Smolen*, 80 F.3d at 1284, n.7.

The evidence in the record does not show that Torrey engaged in any of the listed activities in a manner indicative of an ability to function at a level greater than that proposed by Dr. Northway. For instance, although the ALJ mentions Torrey can get along with others based on her testimony provided at the hearing, of which the ALJ herself questions the credibility, she omits the fact that Torrey qualified her statement to that effect with "there's a lot of hard people to get along with out there." Tr. 83. Torrey's subsequent testimony reveals paranoia, regular feelings of being disliked, and allegations of harassment during her interactions with others. *Id.*

Other areas of the record include extensive endorsements by Torrey that provide a clearer impression of mental and social impairments that support Dr. Northway's marked social limitations findings, such as paranoia, fear, reclusiveness, and depression. Tr. 192. In short, the daily activities the ALJ relied on to reject Dr. Northway's opinion reveal basic physical functionality, not an obvious lack of social or mental limitations.[4]

On balance, the daily activities noted and described by the ALJ do not serve to illustrate a lack of the limitations described and diagnosed by Dr. Northway, and substantial evidence in the record does not support the ALJ's reasoning for rejecting his medical opinion. The ALJ erred in her reasoning for assigning little weight to Dr. Northway's opinion, and this failure affected subsequent analysis regarding the extent to which Torrey's mental limitations would affect her ability to obtain and retain work. Subsequent proceedings should be carried out to resolve this discrepancy. On remand, the ALJ should assign proper weight to Dr. Northway's opinion.

B.    **Global Assessment of Functioning Test Scores**

Torrey also argues that the ALJ erred in rejecting the Global Assessment of Functioning ("GAF") test scores provided by Dr. Northway, Dr. Joffe, and Christine Rogers. I disagree. An ALJ "need not discuss all evidence presented to her. Rather, she must explain why significant probative evidence has been rejected." *Vincent v. Heckler*, 739 F.2d 1393, 1394–95 (9th Cir. 1984).

---

[4] Notably, the ALJ lists an array of Torrey's daily activities in other aspects of her opinion. Tr. 16. Factoring those activities into the ALJ's reasoning for rejecting Dr. Northway's opinion is beyond the scope of this review. Additional analysis of reasons for which those activities contradict Dr. Northway's observations, impressions, and diagnoses would further support the ALJ's legitimate reason for rejection, but that reasoning must still be supported by substantial evidence in the record. *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir. 1983).

The ALJ explained her reasons for providing little weight to the GAF scores. First, she concluded that the scores provided by various physicians did not clarify whether they purported to rate objective functioning assessments or symptoms, which "are an individual's 'own description' of his or her impairments." Tr. 23, *citing* S.S.R. No. 96-7p, 1996 SSR LEXIS 4 (July 2, 1996). Because she found Torrey unreliable, the ALJ chose not to assign weight to scores she determined were derived from subjective symptom reports to treating physicians. *Id.* Second, the ALJ explained that GAF scores do not have a direct correlation to severity requirements in mental disorder listings, further supporting her rejection. Tr. 23, *citing* 65 Fed. Reg. 50,746 (Aug. 21, 2000). Based on these explanations, the ALJ amply fulfilled her requirements for rejecting the various GAF test results.

## II.    Dr. Northway's Intellectual Disability Diagnosis under Step Two and Listing 12.05C

Torrey urges that the ALJ erred in failing to include Dr. Northway's intellectual disability diagnosis at step two of the sequential analysis. Torrey argues that the ALJ repeated this error in concluding that Torrey did not meet the criteria enumerated in Listing 12.05C. Tr. 16. Because the ALJ did not properly reject Dr. Northway's medical opinion and the diagnoses contained therein, I cannot adequately accept or refute the ALJ's comprehensive determination of Torrey's impairments, nor can I do so with regard to the ALJ's grounds for rejecting Torrey's conformity to the Listing 12.05C criteria. On remand, the ALJ should address evidence supporting or discrediting Dr. Northway's findings regarding Torrey's social and mental limitations in both of those contexts.

III.    **The ALJ's Consideration of Lay Witness Testimony**

Torrey also argues that the ALJ erred in her consideration of the lay evidence, particularly a function report provided by Karen VerMeer, Torrey's sister. The ALJ must consider competent lay evidence but, in rejecting such evidence, she need only provide reasons for doing so that are "germane to [the] witness." *Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993); Greger *v. Barnhart*, 464 F.3d 968, 972 (9th Cir. 2006) (internal quotation marks omitted). Relevant here, an ALJ may simply "note[] arguably germane reasons for dismissing the [evidence] even if he did not clearly link his determination to those reasons." *Lewis v. Apfel*, 236 F.3d 503, 512 (9th Cir. 2001).

As the ALJ noted, VerMeer "largely reiterated [Torrey's] allegations regarding her ability to function." Tr. 18. The ALJ found the lay evidence "credible only to the extent it expresses Ms. VerMeer's observations of [Torrey's] activities and not as a medical opinion." *Id.* Torrey contends that this is reversible error because the statements in VerMeer's function report regarding Torrey's difficulty with concentration, memory, and anxiety support further mental RFC limitations than those found by the ALJ. In her counterargument, the Commissioner agrees that the ALJ cannot properly discount VerMeer's function report simply because she is related to Torrey and not a medical source. The Commissioner contends, however, that the ALJ's failure to provide specific reasons for assigning limited weight to VerMeer's function report is, if erroneous, harmless error. This is because the ALJ found VerMeer's function report to "largely reiterate" Torrey's own function report. Tr. 18. Thus, the Commissioner argues, "the ALJ's reasons for finding Plaintiff not credible apply with equal force to Ms. Vermeer." I agree.

An ALJ's failure to comment upon lay evidence "is harmless where 'the same evidence

that the ALJ referred to in discrediting [the claimant's] claims also discredits [the lay witness's]

claims." *Molina v. Astrue*, 674 F.3d 1104, 1122 (9th Cir. 2012), *quoting Buckner v. Astrue*, 646

F.3d 549, 560 (8th Cir. 2011). The ALJ's finding that the lay evidence "largely reiterated"

Torrey's own function report is reflected in the administrative record. For example, both Torrey

and VerMeer listed that Torrey can walk only one block, can pay attention for only ten minutes,

cannot complete tasks due to forgetfulness, and becomes dizzy when climbing stairs. *See* Tr.

186, 194. When weighing the credibility of Torrey's own allegations as to her limitations, the

ALJ systematically favors the objective medical evidence found in the administrative record over

the subjective limitations in Torrey's function report. Tr. 20. Thus, the ALJ's failure to

comment beyond noting the similarities between both function reports fits into the harmless error

framework anticipated in *Molina*, above, and need not be reconsidered on remand.

## IV.    Step Five:  Existence of Competitive Jobs in the National Economy

Torrey argues that the Commissioner did not meet her burden of proof at the step five of

the sequential process. Step five requires the Commissioner to demonstrate that, in light of

Torrey's residual functional capacity, there is a significant number of jobs in the national

economy the she is capable of performing. *Andrews v. Shalala*, 53 F.3d 1035, 1043 (9th Cir.

1995). The Commissioner can satisfy this burden by eliciting the testimony of a VE with a

hypothetical question that sets forth all of the claimant's limitations and restrictions. 20 C.F.R. §

416.966; *Osenbrock v. Apfel*, 240 F.3d 1157, 1163–64 (9th Cir. 2001). In this situation, the ALJ

relied on a VE's testimony in forming her assessments.

Torrey contends that, if Dr. Northway's opinion is properly credited, his findings of

"marked" impairment in interacting appropriately with the public would necessarily alter the

ALJ's step five findings. She further posits Dr. Northway's assessment declaring Torrey unable to adapt to changes in a routine setting, respond to usual work situations, and meet demands associated with competitive work could, if properly credited, alter the ALJ's step five finding.

Where a VE has failed to address a claimant's limitations based on improperly discredited evidence or inadequately considered medical opinions, a remand for further proceedings is proper. *See Harman v. Apfel*, 211 F.3d 1172, 1180 (9th Cir. 2000). Thus, upon reconsideration of the medical evidence of record, Torrey's RFC should be revised and reconsidered by a VE to determine whether there exist competitive jobs in the national economy suitable to Torrey's limitations.

## V.    Remand for Further Administrative Proceedings

The Court may remand this case "either for additional evidence and findings or to award benefits." *Smolen*, 80 F.3d at 1292. Generally, when an ALJ's decision is reversed, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004) (citations omitted). Thus, it is "the unusual case in which it is clear from the record that the claimant is unable to perform gainful employment in the national economy," that "remand for an immediate award of benefits is appropriate." *Id.*

Benefits may be awarded where "the record has been fully developed" and "further administrative proceedings would serve no useful purpose." *Smolen*, 80 F.3d at 1292; *Holohan v. Massanari*, 246 F.3d 1195, 1210 (9th Cir. 2001). Specifically, benefits should be awarded where:

> (1) the ALJ has failed to provide legally sufficient reasons for

> rejecting [the claimant's] evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Smolen*, 80 F.3d 1273 at 1292; *McCartey v. Massanari*, 298 F.3d 1072, 1076–77 (9th Cir. 2002). Because issues still remain regarding plaintiff's mental residual functional capacity as well as her ability to perform other jobs existing in significant numbers in the national economy, remand for further consideration of those issues is warranted.

## CONCLUSION

For the foregoing reasons, the Commissioner's final decision denying Torrey's application for disability insurance benefits and social security insurance is reversed and the case is remanded for further proceedings consistent with this opinion.

Dated this 4th day of November, 2014.

Honorable Paul Papak
United States Magistrate Judge